Case 14-4078 Goodyear Tire and Rubber Company v. Lockheed Martin Corp. Oral argument, 15 minutes per side. Mr. Bergeron for the appellant. Good morning, Your Honors. May the police and court like to reserve three minutes of time for approval? You may. Your Honors, this was a complicated transaction, but the essence of the claim today is fairly simple. The basic structure was that Lockheed got all of the liabilities with certain exceptions not relevant here today. They tried to escape that fact, and that's why we were here last time a couple of years ago, but they lost that. So the only question at this point is, are they on the hook for indemnification? And that turns, as they acknowledge, on the question of whether this is a claim arising out of post-closing operations at the air dock. The indemnification here is not for the environmental damage. It's for the legal costs of fighting about the environment. Exactly, Your Honor. And, in fact, in the underlying lawsuit that Lockheed brought, they sought to require indemnification for us for those same fees. It's true that both sides have flipped sides, but as I understood this, the pollution arose way back, long before the transaction, and you won below because that liability was transferred by the contract. Now we have the question, in effect, when did the claim arise, and the facts clearly arose before the closing. Well, I think you have to look at the question. Normally, when a claim arises isn't when somebody files a piece of paper, a lawsuit. It's when the underlying facts occur. We're not saying that because they brought the claim against us, that is dispositive. That's not what we're saying. What we're saying is, if you look at the language, when did the claim arise post-closing, and what is the predicate for the claim here? The predicate for the claim is the EPA's consent agreement with Lockheed. In fact, that's what they base their entire complaint on against us. Well, I don't think that's quite what the indemnification provisions say. It says the claim has to arise out of operations, right? Out of operations of GAC. This would be after the closing date, right? Yes. I mean, we were here for the first case. And boy, I sure don't remember that first case being about whether the liability arose from post-closing date operations. Well, and the reason for that, Your Honor, is Lockheed was stuck. Because there's the two competing indemnification provisions. So if they came before you and said, this is a pre-closing obligation, they would have been thrown out of court on a motion to dismiss under 6.19.1 because of the two-year tail. It's over. If they came conversely and said, aha, it's a post-closing obligation, they were stuck based on 6.19.1. They just said it wasn't our obligation. We didn't inherit this. Well, now, again, I'm really not interested in the psychoanalysis of why somebody is making an argument. I'm interested in the merits of the case. So, I mean, they argued in that case, this deal did not transfer this liability, period. And we said, yeah, it did. The issue wasn't did this liability arise out of post-closing operations or pre-closing. Everybody knew, I thought. Everybody knew. If we're going to talk about operations as opposed to rainfall, pre-closing, i.e., 1929. Why is that wrong? It's wrong because that's not what they said in their reply brief. Well, I don't particularly care what they said in their reply brief. I mean, we have a clause here that says if the liability arose out of operations after the closing, you win. Pre-closing, you lose. Fair summary? Yes. Okay. And so the question there is operations. That's an interesting word. It's not, you know, caused pre-closing or, you know, it's operations. So it's not rainfall. It's not weather. It's something the business, one of these businesses was doing. And isn't that thing, the operation, building the air dock in 1929 and then some recodings, presumably? Your Honor, I respectfully disagree. Okay. Now, I want to know why you disagree with that. So if you look at the EPA consent agreement, it says, Lockheed, you were on the hook because of your use and your violation of federal environmental laws. So it is saying that it's Lockheed's conduct. It's EPA's use of environmental definitions and interpretations that, quote, use means letting it sit there on your property. Well, Your Honor, I mean, there's And then it turned out, you know, they're right under environmental law, but EPA doesn't get to define normal contract law. Well, but EPA, when the EPA's claim is the source of liability, then that does impact what, you know, how we interpret this indemnification clause. Well, but as Judge Kethledge indicated, it's arising out of the operations. And, again, your position really is that when EPA says use under CERCLA, I guess, that defines operations under this contract. And that's, do you have any, you know, authority where that sort of thing has been done? Well, I think maybe the other way to think about this is, you know, remediation here is not one size fits all. And remediation in this case was predicated on Lockheed's continuing use of the air dock. Like, if it was just sitting there vacant, they would have not done and not incurred, you know, most of what they were, costs they were seeking to recover. Really? I thought they were liable because they own this thing. It was not a coincidence that the liability in this consent agreement was pegged in 1997. It's not a coincidence because that's the year that Lockheed became the owner. It's the ownership, right? Well, but it's their continuing use of the property. There's no indication that they scratched the siding and let the stuff out, is there? I mean, if there was, you'd have some advantage. But this is a legacy of pollution. If you look at what they were agreeing to in the consent agreement, they went through, and it was a litany to continue the continuity of the operations of the air dock. They agreed to training, cleaning, inspection, maintenance, sampling. And all of that was done to ensure that workers could continue to work there for, not today, but for 10 years down the road, 20 years down the road. And that is why you look at the, and I agree with you, Judge Kethledge, the operations is a little bit of a quirky word there. I don't think it's quirky. I think it's actually a nice job of limiting the loss. But I think the underlying purpose is to say, look, once they're in charge, they get all of the benefits of the operations, and they get the concomitant detriments too. And if they want to continue operations at the air dock for the next 50 years, that's great. But if they're taking steps to ensure that's going to happen, they're going to reap the benefits of it, and that is why it is a post-closing obligation under these circumstances, Your Honor. And I do think, and I know we're not persuaded by the point about what they said in the prior appeal, but one of the things we said was . . . You've got to win for judicial estoppel to kick in, right? No, I understand. And you won last time. I'm not saying it's judicial estoppel, but what I am saying is part of our argument was, look, if this is a pre-closing obligation, they're stuck with the two-year tail. And they came back and said, and they're trying to get out of the two-year tail, and they said, no, no, no, no, this is a post-closing. This arises post-closing. So, I mean, I think that, you know, that was . . . And I think the other point here, too, Your Honor, is the Haley's ditch. Because in the prior appeal, when this court found that . . . I think Judge Kessler is going to check me on this. Yeah, well, you know, I'm ready for this. And I appreciate it because it's interesting to have one's work take, you know, deconstructed in this manner by highly intelligent counsel on each side. And I realize I need to order my clauses more carefully in some of my sentences. But, please, let's have that conversation. Yes. Go ahead. So, we made, you know, Haley's ditch kind of came out of the prior appeal. And so we responded to the arguments and made a variety of ones. What this court ultimately accepted was in the last paragraph, where it was interpreting the Ohio law, and it said, you know, Ohio law allows a law key to recover costs that are attributable to releases that the property owner caused or contributed to. After selling the air dock, Goodyear did not cause or contribute to the release. But embedded in that is that Goodyear did not cause or contribute to that. And I think part of the reason for that, as we pointed out in the prior appeal, is that they simply did not introduce any evidence into the record about Haley's ditch. And, in fact, in their prior appeal, if memory serves, they were pointing to allegations in the complaint, not Rule 56 summary judgment evidence. Yeah. Well, I guess I would say, you know, this sentence, after selling the air dock, Goodyear did not cause or contribute to the release of any PCBs upon Haley's ditch. And I guess you're saying, ergo, Lockheed did it after the sale. Okay. I think one could also read this sentence, as inartful as it is, to say, to mean that Goodyear's post-closing actions did not contribute to the contamination of Haley's ditch. In other words, not that Goodyear's actions, period, did not contribute, but specifically Goodyear's post-closing actions were not contributing. And I think that that is a fair reading of that sentence, but my point is that the underlying premise is that if there was some cause or contribute to by Goodyear, I think the result may have been different based on how this paragraph was structured. And so my point is there is no finding that Goodyear did anything related to Haley's ditch. So if it's not us, it's them, and they're seeking recovery from us. Wouldn't they say, though, that this is just, again, an effect of the original usage of the siding? And I think Goodyear dug the ditch is my recollection. Is that right? I don't recall. You don't recall. That's okay. Or GAC. And, I mean, this all literally flowed from the construction in 1929 is what they would say. Again, there's no indication when it actually happened. Yeah. So, yeah, that's obviously their argument. And one final thing I will say is even if there is debate about whether some – you could conceivably have a claim that arose straddle both pre- and post-closing operations, but I think that's where the in whole or in part language in 6.19.2 comes into play and says even if it's only in part post-closing, then we get to seek indemnification, and they don't really have a response to that, Your Honor. So, thank you. Thank you, Counsel. You have your three minutes for rebuttal. Good morning, Your Honors. May it please the Court. My name is Kate Stetson. I represent Lockheed. A few quick points, and then I want to respond to a couple of Mr. Bergeron's statements. The first is, Judge Boggs, yes, you're exactly right. The case that's in front of you now is a case about legal costs, and those legal costs arose from a fight that the parties had about pollution that arose way back before the transaction. So you're exactly right on that. Judge Kethledge, you're also right that the reason you don't remember the first case as being about this question about when the claim arose is because Section 6.19 was not even mentioned in the prior case. It was not even mentioned in your . . . It just wasn't an issue. It wasn't an issue at all. It doesn't mean they're wrong. That's exactly right. The first case was about whether the air dock was an asset of GAC and not of Goodyear, and there was a very complicated, as Mr. Bergeron said, technical aspect and argument that we brought to the Court at that time that said when Goodyear's assets transferred, they said one thing. When GAC's, they said another. We lost that fight. But I want to make very clear that one of the themes that runs through Goodyear's briefing here is that because we lost that fight about whether the air dock is an asset, somehow it carries forward that we must lose this one, and that is a logical fallacy. The question in this case, of course, is when did the claim arose? When did the claim arise for which Lockheed was seeking indemnification? Or when did the operations out of which the claim arose take place? That's right. That's right, and I think the operations . . . Because the claim actually arose. I mean, actually, the claim arose when they found this stuff in their backyard at the air dock. I mean, if that was the question, you'd be in a tough spot. I think you're right, Judge Kethledge, that if we isolate each of those statements and we put greatest emphasis on claim and we put a little bit less emphasis on arose and we ignore operations and we especially ignore operations of the air dock, then we're talking about a claim that arose at some point afterward. But the problem is you can't read that. You can't slice and dice that particular phrase. Okay, so let's say we read it the way I just suggested about when did the . . . what was the time frame of the operations from which the claim arose? I know you think that Goodyear has waived the whole or in part argument, but why doesn't Mr. Bergeron have a point that, hey, at least in part, this claim, i.e., all the liability that Lockheed sustained, arose from Lockheed's own use of the air dock after the closing? I mean, you might have a forklift scrape a wall and some PCBs come off. I mean, presumably, if they're using it, they're doing things that might accelerate or affect the runoff, and therefore, it's in part that usage, even if it's 1%. Well, a couple things first, Judge Kethledge. The first is I don't want even to concede that even if a forklift scraped a wall at some point after 1987, that we'd somehow be on the hook. The consent decree itself, this document that Mr. Bergeron loves to cite, says the air dock was built in 1929, paragraph 8. Goodyear owned the air dock until 1987, paragraph 9. The air dock contained Robertson protective metal, paragraph 10. So it's very clear even from the consent decree that the operations that gave rise to the need to remediate started in 1929. But to your question about in whole or in part, I mean, this is the reason that waiver is an issue, because if this had been presented to the district court, we would have been able to have a conversation in front of the district court about how to deconstruct that particular indemnity provision. If you read the indemnity provision carefully, which is a heavy lift, what you will see is . . . It's been a lot worse, believe me. I'm sorry? The last case was worse, I assure you. I believe you. What you will see at page 54, and I'm looking at page 54 of the asset purchase agreement, which is in the record, page 54 is the beginning of section 6.19.2. And what it says, and you have to clear away some of the underbrush, but what it says is Loral agrees to indemnify and hold GAC and Goodyear harmless against and upon their respective demand to pay or reimburse them for any and all losses, liabilities, all these different words for money, in whole or in part, resulting from cause by arising out of a breach, noncompliance, or, and this is on page 55, for any claim arising out of the operations of GAC subsequent to the closing date. There's no in whole or in part that carries over to that separate or for statement. This is 6.9, the .2 provision? 6.19.2. So if you look at the fourth line from the bottom of page 54 of the asset purchase agreement, you'll see the word pay or reimburse them for any or all losses, et cetera, et cetera, in whole or in part resulting from a breach, a material breach, nonfulfillment. And then if you look at the fourth line from the bottom of that paragraph that carries over onto page 55, you'll see or for any claim arising out of the operations of GAC. So even if we're going to countenance this late-breaking argument, the problem that Mr. Bergeron has is that there's no allocation in whole or in part relating to a claim, any claim arising out of the operations of GAC subsequent to the closing date. And, you know, back to my sort of original starting point in this response, the reason that remediation was necessary was because the air dock was built in 1929 that contained Robertson protected metal. That is the problem. So the fact that the, you know, I was about to say statute, that the APA language doesn't even support this in whole or in part claim just confirms what I'm attempting to argue. Let me make one more point about the reply brief, if I may. Mr. Bergeron contended in his brief to great fanfare that because we say at one point in our reply brief that the obligations arose after the closing date, that we have somehow conceded that the operations occurred before after the closing date. Operations and obligations are two different words. They both start with O and they end with ations, but they are two different words. The fact that even if you agree that we somehow conceded for judicial estoppel purposes, which of course we didn't, that we said something in our reply brief about an obligation, of course an obligation was imposed on Lockheed after the closing date. It was an obligation because at that point it was incumbent on us as the owner of the property to remediate the property. That was our obligation. But that is not a claim and it is not an operation, and those are the words that are relevant in the APA. If there are no further questions from the panel, I'm happy to cede the rest of my time. Thank you. Thank you, counsel. Thanks. Three minutes, Mr. Bergeron. All right, just a couple of responses. First of all, I think the remediation hinges on how you are using the property, and that is another reason why this is a rising of Lockheed's operations because it depends on what workers they've got working there, what they're doing. That is why they're incurring a lot of the costs they're incurring, and if that's not post-closing operations, I'm not really sure what is. You say that is why they're incurring those costs. By that, are you asserting that they've caused additional pollution or are you just saying that that's a business reason? Well, it's both. Because, of course, they would have to remediate under the EPA's requirements whether or not they were continuing to operate, wouldn't they? One of the things, they would have to remediate doing something, but they would not have to incur all the obligations that they incurred, the training, the sampling, all of that stuff. They wouldn't have to incur all of that if the air dock was not operational. Because that's to protect the workers in there? Exactly. And one of the things in the consent agreement says one of your options is to cease using the air dock. Well, they didn't want to do that. I mean, it was critical to their business. Well, Mr. Bergeron, we don't have much of a record, I guess, as to what exactly their use is, right? But the reason is that you didn't argue this in part theory below, and there just was an occasion to flesh out, well, what exactly are these uses and how exactly would these operations themselves cause this damage as opposed to the original construction? I mean, isn't that a practical reason to say, you know, it's waived? Well, no, I don't think so, Your Honor. I mean, we quoted the language that has the inhorn part like twice in the complaint. It was quoted in the summary judgment motion, and I will agree with you. We did not feature that specific clause. But, I mean, this is we're pointing to the very same section of the agreement. We're not going out and finding some other section saying this is a new argument.  Which I think happens every day. What are we supposed to do then? Because, you know, as the records before us, this idea of their use is a pure abstraction, basically. I don't have the, I mean, maybe abstraction. Unless, I mean, you know the record better than I, but I can't describe specifically. I don't know if they have blimps there. Probably not. I don't know what the heck else you put in this giant thing. You know, you might know. What are we supposed to do with this? Well, that's where I think, that's where I keep going back to the consent agreement. Because that details what they have to do. And it doesn't say, it doesn't show, and obviously I agree with you on the record, that it's not well developed on this point. But it is saying you have to undertake all these obligations to ensure that workers are safe, that everyone going there is not going to be, you know, contaminated, et cetera, et cetera. So I think we can tell from what the EPA, what they agree to with the EPA, the nature of what's going on and why they are incurring these costs. So that's . . . Okay. Well, that's helpful. Anything else? Thank you. Okay. Thank you, Your Honors. The Court may call the next case.